**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 05-03163-01-CR-S-DW |
| JASON ROBERTS, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE**

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendant's Motion to Suppress Evidence. A hearing was held before the undersigned on June 27, 2006. Defendant was represented by Robin Aiken, and the government was represented by James Kelleher, Special Assistant United States Attorney.

Defendant moves the Court to suppress statements he made to government agents. He contends that the statements were made in violation of his rights against self incrimination and right to counsel under the Fifth and Sixth Amendment to the United States Constitution. He contends that he invoked his right to counsel during an interview with law enforcement, and that the waiver that he signed was invalid because it was based on impermissible interrogation.

It is the government's position that defendant did not unambiguously request counsel, and that the agent was therefore under no obligation to cease questioning defendant. Additionally, it is contended that after defendant was advised of the subject of the questions, he never again raised the

1

issue of having an attorney present and provided a full and voluntary statement.

The first witness for the government was Sheriff Steven Stapp of the Dade County Sheriff's Department. On June 5, 2005, he responded to a call regarding a sawed-off shotgun and a bomb at the residence of Chastity and Jason Roberts. When he got there, he made contact with Chastity Roberts, and her father, Ray Daniel. Ms. Roberts said the items belonged to defendant. At that time, defendant was at the Dade County Jail, being held on forgery charges. Sheriff Stapp then called Special Agent Wes Patterson of the Bureau of Alcohol, Tobacco and Firearms ["ATF"]. On June 8, 2005, the two officers met with Mr. Roberts at the Dade County Jail. The sheriff testified that he told defendant that he wanted to talk to him about the items they'd found. Once they got to the conference room, the officer introduced him to Agent Patterson. Before talking to defendant, Agent Patterson presented defendant with several ATF forms for Miranda purposes, including a waiver of right to remain silent and a right of advice to counsel form. Agent Patterson explained the forms and then had defendant read the first part of the form aloud. Defendant seemed to understand. After he had read the first part, the Statement of Rights, and signed it, he began reading the second part, the Waiver. He stopped reading, sat back and said something to the effect of, "do I need to get an attorney," in a questioning manner. [Tr. 8]. The sheriff was not sure of the exact words. The sheriff said nothing in response. Agent Patterson started to pick up the forms at that point, and said something like, "well, we'll go ahead and end this if that's what you're wanting." [Id.]. Then, defendant asked what they wanted to ask him about. Once they told him that they wanted to ask him about the shotgun and the bomb, he said, "I'll tell you about that." [Id.]. Defendant wanted to sign the waiver form at that point, and then provided very specific answers to the questions asked of him. According to Sheriff Stapp, defendant never specifically asked for an

attorney, but just wanted to be advised if he needed one. They never threatened or coerced him into giving a statement.

On cross examination, the sheriff testified that defendant was in custody, but was not sure how long he had been there. Defendant's demeanor was very polite, and he has always been that way. He acknowledged that he did not remember defendant's exact words, but he knew it was in the form of a question and that defendant did not state that he wanted an attorney. Defendant had the forms in his hands; he read aloud the first portion, and then started reading the second form, kind of leaned back in his chair, and pushed the papers away. This was in a manner that indicated that he was not going to sign the form. The ATF agent started to gather everything together and was prepared to leave, when defendant asked what they wanted to talk to him about. When they told him, he said he would answer questions about that. Sheriff Stapp testified that it was just a couple of minutes from the time they got introductions out of the way and the agent started to pull back the papers and gathered them to leave. Regarding whether Agent Patterson actually said something like they were going to end the interview, that was just his interpretation of what was said, but he was not really sure if Agent Patterson actually said anything at the time.

The next witness for the government was Agent Wes Patterson of ATF. On June 8, 2005, he went to the jail after the sheriff called him about defendant having a firearm and a potential explosive device. When he got to the jail, he met with Sheriff Stapp, and they decided to interview defendant. The agent presented him with a three-part ATF Miranda form: Statement of Rights, Waiver, and the officer's Certification. He put the form in front of defendant, said he wanted to talk to him, and that he needed to read his rights first. Agent Patterson asked him to read the first part aloud, and he dated and signed it. After he read the second part, he said something like, "maybe

3

I should talk to an attorney." [Tr. 19]. The agent put his hand on the form to end the interview, and defendant asked what they wanted to talk to him about. When they told him, he said he would answer those questions. Based on the officer's training, he knew that a person had to ask for an attorney or had to state that he wanted to speak to one to invoke his right to counsel. Because defendant make a reference to legal counsel, Agent Patterson started to end the interview, even though defendant had not actually asked for an attorney. When defendant heard the subject matter of the questions, Agent Patterson testified that he seemed relieved and said he would sign the waiver form, which he did. Had he invoked his rights, all questioning would have ended, and the case would have been presented to a United States Attorney. Agent Patterson testified that he made it clear as to why he was there. Once he told defendant, he said, "I'll sign that," [Tr. 21], and then answered questions about where he got the gun and what the explosive device was. At no point was defendant threatened or coerced, nor did the officers make an promises to him.

On cross examination, the officer testified that defendant never asked for an attorney, even though he did not remember his exact words when he mentioned counsel. Agent Patterson acknowledged that he started to end the interview. If defendant had invoked his rights, he would have ended it. He explained that when defendant starting making comments about legal counsel, he started to pick up the forms. Then, defendant reinitiated the interview. Agent Patterson explained why he wanted to talk to him after they had given him the form. Agent Patterson reiterated that defendant just started mentioning talking to an attorney. He said something like, "Maybe I should talk to an attorney." [Tr. 25]. The officer did not make any notes of this interview, nor did he tape it. On his report, the only thing that is mentioned regarding an attorney is that defendant hesitated signing the form and made reference to obtaining an attorney. Agent Patterson

4

stated that defendant did not push the form away; he thinks he put his hand on it and pushed it back. He pulled the papers back and started to stand up to leave, when defendant asked what they wanted to know. He was leaving because he was terminating the interview. The agent believed defendant did not want to sign the waiver and did not want to talk to him, based on his actions and words. He did not believe, however, that he was invoking his right to an attorney, but rather, that he did not want to sign the form. After he stood up, he did not say anything, and defendant asked the question. The time span from when they came in until he was getting up to leave was probably two to three minutes.

On redirect, the officer said that defendant never said he didn't want to talk to him, and never used the exact words that he wanted an attorney. When defendant started to mention an attorney, based on the officer's experience, he thought he was going to say that he wanted an attorney and the interview would end, but it never got to that point. In the officer's mind, after defendant found out what they wanted to talk about, he believed defendant was comfortable with continuing the interview. He had signed the form, and he understood he had the right to an attorney.

On recross, the officer repeated that he believed defendant did not want to talk to him, not that he had invoked his right to an attorney. Agent Patterson never said anything to defendant about it being up to him to decide because he never heard defendant ask a question regarding whether he needed an attorney.

The Supreme Court has held that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. <u>Miranda v. Arizona,</u> 384 U.S. 436, 469-473 (1966). It held in <u>Edwards</u> that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is

5

present. Edwards v. Arizona, 451 U.S. 477 (1981). The Court must determine whether an accused has actually invoked his right to counsel, under an objective standard. Davis v. United States, 512 U.S. 452, 459 (1994).

In Davis, the Supreme Court examined what an actual invocation of rights might consist of, finding that it "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Id. at 459. (internal citation omitted). "But, if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." Id. "Rather, the suspect must unambiguously request counsel." Id. A suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect." Id. In the instant case, a careful review of the testimony satisfies the Court that, although it could be concluded that defendant considered invoking his right to counsel, he did not do so. Under the facts of this case, it cannot be said that he articulated his desire to have counsel present in such a manner that the officers reasonably understood that he was requesting counsel. Agent Patterson credibly testified that he started to leave because he thought that defendant might be considering making a request for an attorney, but that he did not do so. The officer testified that he thought that maybe defendant did not want to talk to him, but that his impression was never that he invoked his right to counsel. It was also Sheriff Stapp's belief that defendant was basically wondering if he should get an attorney, but that he never made a request for one. Both officers

6

expressed an objectively reasonable belief that defendant had not invoked his right to counsel. The Court finds that, based on the totality of the circumstances of this case, defendant did not make an unequivocal request for counsel, which the law requires. Further, even assuming that defendant might have started to invoke his right to counsel, he clearly abandoned this intention when he initiated, completely of his own accord, further conversation with the officer and willingly answered questions after signing the waiver form. Because the Court finds that there was no constitutional violation in this case, it must be recommended that defendant's motion to suppress be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's motion to suppress evidence should be denied.

 /s/ James C. England
JAMES C. ENGLAND, CHIEF
United States Magistrate

Date: August 21, 2006